**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **10 E. WASHINGTON AVE., LLC**, | |
| Plaintiff, | Civil Action No. 21-15695 (ZNQ) (RLS) |
| v. | **OPINION** |
| **AMGUARD INSURANCE COMPANY**, | |
| Defendant. | |

**QURAISHI, District Judge**

    **THIS MATTER** comes before the Court upon Defendant AmGUARD Insurance Company's ("Defendant" or "AmGUARD") Motion for Summary Judgement (ECF No. 38) and Plaintiff 10 E. Washington Ave., LLC's ("Plaintiff" or "10 E. Washington Ave.") Cross-Motion for Summary Judgment[1] (ECF No. 39). In support of its Motion, Defendant filed a Moving Brief. ("D's Moving Br.", ECF No. 38-2.) Plaintiff opposed ("P's Opp'n", ECF No. 43) and Defendant replied ("D's Reply", ECF No. 44). In support of its Cross-Motion, Plaintiff filed a Moving Brief. ("P's Moving Br.", ECF No. 39-1.) Defendant opposed ("D's Opp'n", ECF No. 42) and Plaintiff replied ("P's Reply", ECF No. 45).

    Having reviewed both parties' submissions filed in connection with the Motion and Cross-Motion, and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1, for the reasons set forth below and for good cause appearing, the

---

[1] For clarity, Plaintiff's motion is a completely independent and competing motion for summary judgment rather than a "cross-motion" within the meaning of Local Civil Rule 7.1(h) that involves a truncated briefing schedule.

Court will **GRANT** Defendant's Motion for Summary Judgment and **DENY** Plaintiff's Cross-Motion for Summary Judgment.

## I.   <u>BACKGROUND AND PROCEDURAL HISTORY</u>

Plaintiff is a New Jersey Limited Liability Company.  Plaintiff purchased and acquired title to 10-12 E. Washington Ave., Washington, NJ 07882 ("Property") by deed on December 19, 2019.[2]  (*See* Plaintiff's Statement of Undisputed Material Facts, "P's SUMF", ECF No. 39-4 ¶ 1; Defendant's Statement of Undisputed Material Facts, "D's SUMF", ECF No. 38-1 ¶ 9).  Defendant AmGUARD Insurance Company initially issued policy number ONBP094886 ("Policy", ECF No. 38-8 Ex. E) to Plaintiff to insure the Property for the coverage period from December 18, 2019, to December 18, 2020, and the Policy was subsequently renewed for an additional year after the initial coverage period.  (*See* P's SUMF ¶¶ 2–3.)

Plaintiff filed its Complaint on June 7, 2021, in the Superior Court of New Jersey, Law Division, Warren County.  (ECF No. 1; *see also* "D's SUMF", ECF No. 38-1 ¶ 1).  The Complaint included a single count for declaratory relief seeking, *inter alia*, that Defendant must provide insurance coverage and reimburse Plaintiff for costs that resulted from damage to the Property wall in August 2020 and collapse of part of the Property façade in March 2021.  (*See* ECF No. 1; D's SUMF ¶ 2.)  Plaintiff claims it has incurred $395,652.84 in total costs and/or liabilities ($329,673.89 in construction expenses and $65,978.95 in management and legal costs) (*see* Trematore Decl. ¶ 28) "repairing and managing the [P]roperty by reason of the façade collapse" after Defendant declined to extend insurance coverage.  (P's SUMF 25.)[3]  Defendant filed a notice of removal to this Court on August 19, 2021.  (*See* ECF No. 1; D's SUMF ¶ 3.)  On September 20,

---

[2] Plaintiff contends it is owned by Adam Trematore and Samantha Trematore.  (*See* Declaration of Brian Trematore in Support of P's Motion for Summary Judgment, "Trematore Decl.", ECF No. 39-2 ¶ 3.)
[3] Defendant disputes that Plaintiff has accrued this amount in costs.  (*See* D's Response to P's SUMF ¶ 25.)  Defendant does not seek attorneys' fees and costs in its Motion.

2021, Plaintiff filed an Answer with Affirmative Defenses in this Court.  (*See* D's SUMF ¶ 4.)  On September 19, 2023, Defendant filed its Motion for Summary Judgment.  (D's Moving Br.)  On October 18, 2023, Plaintiff opposed (P's Opp'n) and on October 31, 2023, Defendant replied (D's Reply).  Also on September 19, 2023, Plaintiff filed its Cross-Motion for Summary Judgment. (P's Moving Br.)  On October 18, 2023, Defendant opposed ("D's Opp'n") and on October 31, 2023, Plaintiff replied (P's Reply).

## II.   __UNDISPUTED FACTS__[4]

### A.    __THE PROPERTY__

The Property is a three-story "Retail/Multiple Family" building with six bedrooms and six bathrooms.  (D's SUMF ¶ 11.)  A retail store occupies the first floor, which it has occupied for 42 years.  (*See* ECF No. 38-10 at 4.)  However, the building itself pre-dates the store.  (*See id.*)  In addition to the retail store on the first floor, there are three apartments each on the second and third floors.  (*Id.*)  The façade is a "combination of brick and wood framing covered on the exterior with stucco."  (ECF No. 38-17 Ex. L.)  Prior to purchasing the Property in late 2019, Plaintiff retained Sherlock Home Inspectors ("Sherlock") to inspect the property.  (D's SUMF ¶¶ 9–10.)  On November 13, 2019, Sherlock inspected the Property and issued a report.  (D's SUMF ¶ 10; "Sherlock Report", ECF No. 38-7 Ex. D.)  The inspection revealed a number of issues with the Property: Sherlock observed water stains on the ceiling of the retail store on the first floor, on the ceiling of Apartment 3M, and on the ceiling of Studio Apartment 3R, as well as water damage on the wall by the rear window in Studio Apartment 2R.  (*See* D's SUMF ¶¶ 13–16; Sherlock Report at 22–24, 26, 28.)  In addition, Sherlock observed evidence of prior water leakage on the roof. (*See* D's SUMF ¶ 17.)  The Sherlock Report concluded that "[i]t is apparent that routine

---

[4] As the title of this section implies, the Court has gleaned these facts from the parties' undisputed statements of material fact.  Unless otherwise noted, the factual statements are undisputed.

maintenance has been neglected for the most recent part of the building life." (Sherlock Report at 31; D's SUMF ¶ 18.) Sherlock opined that "the building reflects excessive wear with some neglect" and that "the evidence suggests that the structural, cosmetics, maintenance areas, electro-mechanical, plumbing systems, and the roof will require immediate maintenance, repair, and attention." (Sherlock Report at 31.) Sherlock further opined that the building "had reached the age at which routine, major repair, replacement, and upgrading is to be expected." (*Id.*) Additionally, Sherlock recommended that the property be "further evaluate[d] for hidden damage and possible mold." (*Id.* at 26.)

### B.     BUILDING DAMAGE AND COLLAPSE INCIDENTS

#### 1.     The August 2020 Incident

On or about September 4, 2020, Plaintiff filed an insurance claim pursuant to the Policy regarding property damage ("2020 Incident") that allegedly occurred on or about August 17, 2020. (*See* D's SUMF ¶ 29; ECF No. 38-9 Ex. F.) In its claim, Plaintiff provided the following description of the 2020 Incident: "Plate glass storefront window *cracked* and *leaked water* inside store[ ] (which has since been replaced by owner)" and "Building façade sustained *wind damage* that caused *cracks and fissures* which extend from the exterior of the building to the interior of Apartment 2M." (D's SUMF ¶ 30; ECF No. 38-9 Ex. F) (emphases added).

After filing its claim pertaining to the 2020 Incident, Plaintiff hired Bertin Engineering ("Bertin") to evaluate the front wall's condition. (*See* D's SUMF ¶ 31.) On September 16, 2020, Bertin inspected the Property and recorded its findings in a report, dated September 17, 2020. (*See id.*; "Bertin Report", ECF No. 38-10 Ex. G.) Bertin observed that "[t]he condition of [the] front wall seems precarious and *requires immediate attention due to the visible cracks, moisture in the wall cavities and observed bow*." (D's SUMF ¶ 32; Bertin Report at 3) (emphasis added). Bertin also noted that, in the second-floor apartment facing the street:

> *Several vertical and horizontal cracks are visible* in the walls that are pronounced along the corners, ceiling and window lintels. . . .
>
> *The front wall has moved away from the partition wall* that runs perpendicular to the front, between the bedroom and the living space. *There is a wide crack that runs the full height of the wall . . . .*

(D's SUMF ¶ 34; Bertin Report at 5.) (emphases added).

After a portion of sheet rock was removed, Bertin observed that there was "a lot of *moisture present in the wall cavities. A plastic sheet vapor barrier was found and has collected water in its folds; the insulation, where present is soaked; the brick and sheetrock is wet; and there is organic growth* on the back face of the sheetrock. . . ." (D's SUMF ¶ 35; Bertin Report at 6) (emphases added). Bertin provided the following recommendations in its Report:

> *The current condition requires immediate attention* due to the displacement of the wall and *the presence of moisture in the wall cavity*. This is not an imminent danger, but *needs to be addressed as soon as possible, but before this coming winter*. . . .
>
> As the brick wall is supported on a lintel below, *we propose exposing the lintel to check its condition. This is important because water has been seeping into the wall cavity* and may have impacted the lintel.

(D's SUMF ¶ 36; Bertin Report at 6) (emphases added).

On October 16, 2020, a municipality construction official posted an "Unsafe Structure Notice" on the retail storefront on the first floor of the Property. ("Unsafe Structure Notice", ECF No. 42-3 Ex. 1.) The notice included the Property's address, declared the Property "unsafe for human occupancy" due to the loose façade above the store, and stated that "no individual is to occupy the building until the structure is rendered safe and secure." (*Id.*) The construction official, Ray Stoever, included with the notice his business card that featured the municipality seal. (*See id.*)

After Plaintiff notified AmGUARD of the 2020 Incident via the September 4, 2020 claim, AmGUARD retained Raphael & Associates ("Raphael") as its adjusters to investigate the alleged wind damage to the Property's façade. (*See* D's SUMF ¶ 37; "Raphael Initial Report", ECF No. 38-11 Ex. H.) Raphael, in turn, retained engineering firm Peter Vallas Associates, Inc. ("PVA") to perform a forensic inspection to determine the cause of the separation of the façade from the building. (*See* D's SUMF ¶ 38; Raphael Initial Report at 3.) The Raphael Initial Report, dated October 29, 2020, quoted the following excerpt from PVA's preliminary investigative analysis: "The left side appears to have been impacted by the *ongoing water intrusion* from the leader with the steel beam at the second floor and lintels at the window heads possibly experiencing *oxide jacking*,[5] which would cause expansion of the steel that could cause the noted bulging and cracking." (D's SUMF ¶ 39; Raphael Initial Report at 3) (emphases added). Raphael also noted that the Property had been deemed an unsafe structure by a local official, opined that the wind velocity (with a maximum sustained wind speed of around thirteen miles per hour) was *not significant enough to have caused the damage to the façade*, and stated that the Property's prior owner had filed two weather-related water damage claims involving the Property's roof in July 2016 and July 2018. (D's SUMF ¶ 40; Raphael Initial Report at 3–5) (emphasis added).[6] Raphael stated that the claim was "clearly excluded from coverage" (Raphael Initial Report at 5), but

---

[5] "Oxide jacking" is also known as "rust jacking." It is defined as "displacement of elements due to steel products and iron expansion as metal undergoes rusting and turns to iron oxide. Corrosion of metals such as aluminum could also lead to oxide jacking." *Oxide Jacking*, Corrosionpedia, https://www.corrosionpedia.com/definition/1348/oxide-jacking (Mar. 25, 2024, 1:24 PM). "Rust forms when oxygen and iron react with each other . . . . usually in the presence of an electrolyte like water." (*Id.*)

[6] Plaintiff does not dispute that the Raphael Initial Report contains this language, but disputes the cause of the ultimate façade collapse. (*See* "P's Response to D's SUMF", ECF No. 43-1 ¶¶ 39–40.) Plaintiff states that the Raphael Initial Report never identified a specific cause of the damage in the 2020 Incident, and that PVA's only conclusion, as excerpted in the Raphael Initial Report, was that the 2020 Incident was not caused by wind, and that there "appeared (without conclusion) to be ongoing water intrusion. (P's Opp'n at 4.) Plaintiff alleges that "there was never any physical evidence, such as moisture in the hardwood flooring," to support the stated cause of the collapse—"ongoing water intrusion"—in the November 5, 2020, denial of coverage. (P's Moving Br. at 5.) Moreover, Plaintiff additionally alleges that "there were never any tenant complaints or prior losses relating to any 'seepage or leakage.'" (P's Moving Br. at 5; Trematore Decl. ¶ 11).

recommended waiting for a full engineering report prior to issuing a coverage determination letter. (D's SUMF ¶ 41.)

PVA's initial report, also dated October 29, 2020, provided further insight into the condition of the Property.  (*See* D's SUMF ¶ 42; "PVA Initial Report", ECF No. 38-14 Ex. I.) PVA stated that it had examined the Property on October 23, 2020, with one of Plaintiff's owners, Adam Trematore, in attendance, and that Raphael had assigned PVA to "review the structural integrity of the front exterior wall in regards to any damage that occurred on the date of loss and to review a report, prepared by . . . Bertin . . . which noted the wall is 'precarious and requires immediate attention.'"  (D's SUMF ¶ 43; PVA Initial Report at 2; Trematore Decl. ¶ 3.) Supporting the conclusions in Raphael's Initial Report, PVA confirmed "horizontal cracking" in the Property's exterior and interior, as well as dampness and water staining in the interior.  (D's SUMF ¶ 44; PVA Initial Report at 3.)  PVA also echoed the Raphael Initial Report's finding that the maximum sustained wind speed in the area on the day of the 2020 Incident was around thirteen miles per hour and the maximum wind gust was twenty-one miles per hour.  (*See* D's SUMF ¶ 45; PVA Initial Report at 3–4.)  PVA concluded, "based on a reasonable degree of engineering certainty," that:

> The wind event on the noted date of loss did not appear to impact the south wall of the building.
>
> The south façade is in a very dangerous condition with the structural integrity questionable. . . .
>
> The building has been deemed an unsafe structure by the local Construction Official but is presently occupied. In addition, protection for the public that utilize the sidewalk needs to be provided immediately.

(D's SUMF ¶ 46; PVA Initial Report at 4.)

On November 5, 2020, Raphael issued a denial of coverage letter to Plaintiff.  (*See* D's SUMF ¶ 47; P's SUMF ¶ 6; "Raphael Denial Letter", ECF No. 38-15 Ex. J & ECF No. 39-3 Ex. C.)  The Raphael Denial Letter quoted multiple Policy provisions (D's SUMF ¶ 48), including exclusions for "Neglect," "Other Types of Loss," "Continuous Or Repeated Seepage or Leakage O[f] Water," and "Negligent Work."  Policy at 18–19 (SECTION I—Property, B. Exclusions, 2. k. Neglect, l. Other Types Of Loss, and p. Continuous Or Repeated Seepage Or Leakage Of Water; 3. c. Negligent Work).  Raphael provided the following reasons for its denial of coverage:  "[T]he damage to the [P]roperty has been determined to be from ongoing water intrusion from the leader with the steel beam at the second floor.  The damage appears to have taken place over an extended period of time.  We regret to inform you that coverage would not apply."[7]  (D's SUMF ¶ 48; Raphael Denial Letter at 4.).  Around the time of the denial letter, the municipality sent a notice to Plaintiff via email ordering Plaintiff to repair the Property façade, and to take safety measures "*immediately* for protection of the public."  (P's SUMF ¶ 9; ECF No. 39-3 Ex. E) (emphasis added).  In late 2020, Plaintiff renewed the policy with AmGUARD (which was set to expire on December 18, 2020), thereby insuring the Property in its condition as of the November 5, 2020, denial for a subsequent year.  (P's SUMF ¶¶ 3, 10.)

### 2.   The March 2021 Collapse

On March 2, 2021, a "built-up beam" in the Property façade above the street collapsed. (ECF No. 39-3 Ex. G; ECF No. 38-17 Ex. L.)  After the façade collapsed ("2021 Collapse"), the Property became unusable.  (P's SUMF ¶ 13.)  On March 3, 2021, Plaintiff's counsel, the Ullrich

---

[7] Plaintiff does not dispute that the Raphael Denial Letter contains this language.  However, Plaintiff claims that Raphael's conclusion that "ongoing water intrusion . . . over an extended period of time" caused the 2020 Incident was not supported by PVA's Initial Report, which only concluded that wind was not to blame and did not include a specific cause of damage.  (P's Response to D's SUMF ¶ 48; *see also* Trematore Decl. ¶ 10.)  In addition, Plaintiff maintains that Raphael/PVA did not properly investigate the Incident.  (P's Response to D's SUMF ¶ 48.)

Law Firm, LLC ("Ulrich") responded via letter to Raphael's Denial Letter.  (*See* D's SUMF ¶ 49; "Ullrich Letter", ECF No. 38-16 Ex. K & ECF No. 39-3 Ex. H.)  Ullrich contended that Raphael's investigation underlying the Raphael Denial Letter—including Raphael and PVA's findings that "ongoing water intrusion" caused the damage and that "[t]he damage appears to have taken place to over an extended period of time"—"was either conducted in bad faith or negligently performed." (D's SUMF ¶ 50; Ullrich Letter.)  Ullrich informed Defendant that the entire front portion of the Property's façade had collapsed the day before.[8]  (*See* D's SUMF ¶ 50; Ullrich Letter.)  Ullrich purported to state that it was making a "claim and demand for coverage" pertaining to the March 2, 2021 collapse.[9]  On March 12, 2021, Ullrich followed up with Defendant via email.  (*See* ECF No. 39-3 Ex. I.)  That same day, Defendant determined it would "uphold the disclaimer" in its prior denial of coverage.  (ECF No. 39-3 Ex. J.)

Just under six months after the façade collapse, Plaintiff retained Wood Science Consulting ("WSC") to investigate the cause of the damage.  (*See* D's SUMF ¶ 52; "WSC Report", ECF No. 38-17 Ex. L & ECF No. 39-3 Ex. L.)  WSC inspected the property on August 31, 2021, and collected samples for analysis.[10]  (*See* D's SUMF ¶ 53; WSC Report at 1.)  The WSC Report, dated September 15, 2021, stated that the "built-up beam" on the western side of the façade collapsed due to "long-term, advanced wood decay," which "can often be referred to in laymen's terms as 'dry rot.'"[11]  (D's SUMF ¶ 54; WSC Report at 2.)  WSC opined that the wood decay/dry rot

---

[8] Plaintiff contends that it was in the process of repairing the Property at the time of the March 2, 2021, collapse.  (*See* P's SUMF ¶ 12.)  Defendant disputes this assertion.  ("D's Response to P's SUMF", ECF No. 42-1 ¶ 12.)

[9] Plaintiff appears to contend that the Ullrich Letter constituted a new claim for coverage resulting from the March 2, 2021, collapse.  (P's SUMF ¶ 14; Ullrich Letter.)  Defendant disputes this, stating that "AmGUARD has adjusted this mater as a single claim, not two separate claims."  (D's Response to P's SUMF ¶ 14.)

[10] Defendant notes that WSC's inspection was conducted several months after the façade collapse and that "WSC never observed the Property before or immediately after the reported loss in August 2020 or before the collapse in March 2021."  (D's SUMF ¶ 54.)  Plaintiff does not dispute this statement.  (*See* P's Response to D's SUMF ¶ 54.)

[11] The report did, however, note that the term "dry rot" is a "misnomer because, despite appearances, wood decay requires certain levels of moisture to develop and survive.  Additionally, in the advanced state of wood decay the physical condition of the wood starts to essentially disintegrate."  (WSC Report at 2.)

"occurred gradually over time." (WSC Report at 3.) The WSC Report concluded that the wood decay/dry rot was "hidden from view" and that Plaintiff did not know about the presence of such decay prior to the façade collapse. (D's SUMF ¶ 55; WSC Report at 3.) Although WSC determined that no individual had specifically observed the decay as it was hidden behind the retail store façade, WSC also noted that "there were documented concerns associated with the condition of the façade by Bertin Engineering as well as the local building official . . . ." (D's SUMF ¶ 56; WSC Report at 3.)

Also on September 15, 2021, Ullrich forwarded to Defendant a copy of the WSC Report and "demanded that [Defendant] afford coverage so the necessary repairs may begin." (ECF No. 39-3 Ex. N.) The Borough of Washington, Warren County, subsequently ordered Plaintiff to "demolish the . . . structure by November 8, 2021, or take corrective action to repair the damages to the Property to "render [it] temporarily safe and secure" by that date.[12] (Trematore Decl. ¶ 25; ECF No. 39-3 Ex. O.) Defendant confirmed to Plaintiff, via email on October 17, 2021, that it would not perform an engineering inspection prior to demolition of the Property. (*See* ECF No. 39-3 Ex. P.)

On February 23, 2022, Plaintiff again retained Bertin to produce a supplemental report ("Bertin Suppl. Report", ECF No. 39-3 Ex. Q), which Plaintiff supplied to Defendant. (P's SUMF ¶ 27.) The Bertin Supplemental Report stated that after the collapse, the second-floor cast iron "U" shaped lintel which spanned approximately twenty-four feet between party walls had been removed for purposes of new wall construction, revealing "a full-depth crack . . . on both sides of the vertical beam approximately two feet from the . . . western edge." (*Id.* at 1–3.) Bertin relied on the WSC Report, determining that "there was hidden, long-term, advanced decay of the wood

---

[12] Plaintiff claims it began to make the repairs required by the municipality. (P's SUMF ¶¶ 22–23.) Defendant disputes this. (D's Response to P's SUMF ¶¶ 22–23.)

framing at the western side of the façade, causing its collapse.  (*Id.* at 1.)  In this supplemental

report, Bertin concluded that, "[b]ased on the location of the crack [on both sides of the vertical

legs of the second-floor beam on the western edge] and advanced wood decay . . . , it can be

determined that the crack resulted from stresses created by the decayed wood from the façade

above."  (*Id.* at 1.)

On June 27, 2022, Defendant again retained PVA to visit the property and perform an

investigative analysis to "determine the cause of the façade collapse."  ("PVA Investigative

Report", ECF No. 39-3 Ex. K at 1–2.)  The PVA Investigative Report, dated July 12, 2022,

reviewed documents including the prior PVA Initial Report and the WSC Report.  (*See id.* at 1–

5.)  It found that "the decay of the wood noted in the [WSC] Report would have occurred over a

long period of time . . . so the supporting steel beam may have dropped down . . . . However, this

was not the cause of the collapse . . . ."  (*Id.* at 6.)  PVA concluded that "it appears that the wall

. . . fell outward from the . . . cracking and bowing that was probably caused by oxide jacking of

the steel lintels at the two interior wyethes," causing the free-standing wall to collapse under its

own weight.  (*Id.*)  In addition, the PVA Investigative Report stated that the maximum wind gust

in the area on the day of the 2020 Incident "did not impose forces that could cause the noted

damage."[13]  (PVA Investigative Report at 3–4.)

## C.     THE POLICY

Defendant AmGUARD issued the Policy to Plaintiff to insure the Property from December

18, 2019, to December 18, 2020.  (*See* P's SUMF ¶ 2.)  Plaintiff then renewed the Policy for an

additional one-year period.  (*See* P's SUMF ¶ 3.)  The Policy includes "Building Coverage" for

---

[13] However, the PVA Investigative Report noted: "[T]his does not appear to be a one-time event, but it is apparent that over the years, the main street façade has been subjected to constant wind, and in all probability, wind or wind gusts higher than the noted 21 mph [on the day of the 2020 Incident]."  (PVA Investigative Report at 4.)

losses of up to $936,000.  (P's SUMF ¶ 4.)  The Policy contains a "Businessowner's Coverage

Form" (BP 00 03 01 10) providing first-party coverage for "direct physical loss of or damage to

Covered Property . . . caused by or resulting from any Covered Cause of Loss."  (P's SUMF ¶ 19;

(Policy at 1 (Section I—Property, A. Coverage).)  Enumerated Causes of Loss include "[r]isks of

direct physical loss unless the loss is: . . . [e]xcluded . . . or . . . [l]imited . . . . in Section I."  (D's

SUMF ¶ 20; Policy at 2 (Section I—Property, A. Coverage, 3. Covered Causes of Loss).)

The Policy, however, excludes from coverage certain types of damage.  One such

exclusion, for Collapse, states:

> 2. We will not pay for loss or damage caused by or resulting from
> any of the following:
> ***
> i. Collapse
> (1) *Collapse*, including any of the following conditions of property
> or any part of the property:
> (a) An *abrupt* falling down or caving in;
> (b) Loss of structural integrity, including separation of parts
> of the property or property in danger of falling down or
> caving in; or
> (c) Any *cracking, bulging, sagging, bending, leaning,
> settling, shrinkage or expansion* as such condition relates to
> Paragraph i. (1)(a) or i. (1)(b).  But if collapse results in a
> Covered Cause of Loss at the described premises, we will
> pay for the loss or damage caused by that Covered Cause of
> Loss.
> (2) This Exclusion i., does not apply:
> (a) To the extent that coverage is provided under the
> *Additional Coverage—Collapse*; or
> (b) To collapse caused by one or more of the following:
> (i) The "*specified causes of loss*";
> (ii) Breakage of building glass;
> (iii) Weight of rain that collects on a roof; or
> (iv) Weight of people or personal property.

(D's SUMF ¶ 21; Policy at 18 (Section I—Property, B. Exclusions, 2., i. Collapse)) (emphases

added).

As paragraph 2(a) above notes, the Policy does provide limited coverage in the "Additional Coverage" section for "abrupt collapse" under certain circumstances.  This section is excerpted below in relevant part:

> d. Collapse
> The coverage provided under this Additional Coverage – Collapse applies only to an *abrupt collapse* as described and limited in Paragraphs d.(1) through d.(7).
>> (1) For the purpose of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.
>> (2) We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this policy or that contains Covered Property insured under this policy, if such collapse is caused by one or more of the following:
>>> (a) *Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;*
>>> ***
>> (3) This Additional Coverage – Collapse does not apply to:
>>> (a) *A building or any part of a building that is in danger of falling down or caving in*;
>>> (b) A part of a building that is *standing, even if it has separated from another part of the building*; or
>>> (c) A building that is *standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion*.
>>> ***

(D's SUMF ¶ 23; Policy at 4–5 (Section I—Property, A. Coverage, 5. Additional Coverages, d. Collapse)) (emphases added).

In addition, the Policy contains an exclusion "for loss or damage caused directly or indirectly" by a number of conditions including fungi, wet rot or dry rot  (Policy at 17 (Section I— Property, B. Exclusions, 1., i. "Fungi", Wet Rot Or Dry Rot)), "regardless of any other cause or

event that contributes concurrently or in any sequence to the loss." (D's SUMF ¶ 25; Policy at 14

(Section I—Property, B. Exclusions, 1.).) The Policy excludes:

> i. "Fungi", Wet Rot Or Dry Rot
> Presence, growth, proliferation, spread or any activity of "fungi", wet rot or dry rot.
> *But if "fungi", wet rot or dry rot result in a "specified cause of loss", we will pay for the loss or damage* caused by that "specified cause of loss". This *exclusion does not apply*:
>> (1) When "fungi", wet rot or dry rot result from fire or lightning; or
>> (2) To the extent that coverage is provided in the *Limited Coverage For "Fungi", Wet Rot Or Dry Rot Additional Coverage*, with respect to loss or damage by a cause of loss other than fire or lightning.

(D's SUMF ¶ 25; Policy at 17 (Section I.B.1.i.)) (emphasis added). The Policy does, however,

provide "Limited Coverage For 'Fungi', Wet Rot Or Dry Rot." That section states, in relevant

part:

> r. Limited Coverage For "Fungi", Wet Rot Or Dry Rot
> (1) The coverage described in Paragraphs r.(2) and r.(6) only applies when the "fungi", wet rot or dry rot are the result of a *"specified cause of loss" other than fire or lightning* that occurs during the policy period and *only if all reasonable means were used to save and preserve the property from further damage* at the time of and after that occurrence.
> (2) We will pay for loss or damage by "fungi", wet rot or dry rot. As used in this Limited Coverage, the term loss or damage means:
>> (a) Direct physical loss or damage to Covered Property caused by "fungi", wet rot or dry rot, including the cost of removal of the "fungi", wet rot or dry rot;
>> ***
> (3) *The coverage described under this Limited Coverage is limited to $15,000.*

(D's SUMF ¶ 27; Policy at 11–12 (Section I—Property, A. Coverage, 5. Additional Coverages, r.

Limited Coverage For "Fungi", Wet Rot or Dry Rot)) (emphasis added).

The Policy defines "Specified causes of loss" as follows:

H. Property Definitions

\*\*\*

12. "Specified causes of loss" means the following:
Fire; lightning; explosion; *windstorm or hail*; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; *water damage*.

\*\*\*

c. *Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance* (other than a sump system including its related equipment and parts) containing water or steam.

(D's SUMF ¶ 28; Policy at 30 (Section I—Property, H. Property Definitions)) (emphasis added).

Furthermore, the Policy excludes from coverage "loss or damage caused by or resulting from . . . . *[n]eglect* of an insured to use *all reasonable means to save and preserve property from further damage* at and after the time of loss"; *"[w]ear and tear"*; *"[r]ust* or other *corrosion, decay, deterioration, hidden or latent defect*"; and "loss or damage caused by or resulting from . . . . *[c]ontinuous or repeated seepage or leakage of water*, or the presence or condensation of *humidity, moisture or vapor*, that occurs over a period of 14 days or more."  (D's SUMF ¶ 24; Policy at 18–19 (Sections I.B.2.k., l. & p.; I.B.3.c.)) (emphases added).[14]   The Policy also excludes from coverage "Negligent Work," defined as: "Faulty, inadequate or defective: . . . (2) Design, specifications, workmanship, *repair, construction*, renovation, remodeling, grading, compaction; . . . or (4) *Maintenance; of part or all of any property* on or off the described premises."  (Policy at 19 (Section I.B.3.c.)) (emphases added).

---

[14] In addition to these exclusions, the Policy also imposes certain duties in the event of loss, including that the insured must "*[t]ake all reasonable steps* to protect the Covered Property from further damage[ ] . . . ."  (D's SUMF ¶ 24 n.1; Policy at 21 (Section I—Property, E. Property Loss Conditions, 3. Duties In The Event Of Loss Or Damage, a.(4)) (emphasis added).

III.   **LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986), and it is material "if, under the substantive law, it would affect the outcome of the suit."  *United Therapeutics Corp. v. Sandoz, Inc.*, Civ. Nos. 12–CV–1617, 13–CV–316, 2014 WL 1405044, at *1 (D.N.J. Apr. 10, 2014) (citing *Anderson*, 477 U.S. at 248).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor.  *See id.* at 255.

A movant for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).[15]

---

[15] Local Civil Rule 56.1 requires that a motion seeking summary judgment include a statement of material facts not in dispute and that an opponent of summary judgment shall file "a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion." L. Civ. R. 56.1(a).  The rule further provides that "any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion." *Id.; see also Grant v. Revera Inc.*, Civ. No. 12-5857, 2014 WL 7341198, at *2 (D.N.J. Dec. 23, 2014) ("Where . . . a party fails to respond to the movant's statement of undisputed material facts . . . with a precise citation to the factual record where contrary evidence exists, then the Court assumes that the opponent has no evidence raising a genuine dispute with the movant's stated fact.").

Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has made this showing, the burden then shifts to the party opposing summary judgment to proffer "'specific facts showing there is a genuine issue for trial.'" *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) (providing that a party alleging a fact is genuinely disputed "must support the assertion by . . . citing to particular parts of materials in the record").

When parties submit cross-motions for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. § 2720, at 335–36 (3d ed.1998); *accord Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (stating that "[e]ach motion must be considered on its own merits.")

## IV.    **DISCUSSION**

Courts interpret insurance policies using general contract principles. *See Sosa v. Mass. Bay Ins. Co.*, 458 N.J. Super. 639, 646 (App. Div. 2019). "Under New Jersey law, '[i]nsurance coverage is a matter of contract law determined by the language of insurance agreements.'" *Tripodi v. Universal N. Am. Ins. Co.*, Civ. No. 12-1828, 2013 WL 6903944, at *5 (D.N.J. Dec. 31, 2013) (quoting *Ayala v. Assured Lending Corp.*, 804 F. Supp. 2d 273, 281 (D.N.J. 2011)); *accord Parko Props., LLC v. Mercer Ins. Co. of New Jersey*, Civ. No. A-4137-17T2, 2020 WL 6799137, at *3 (N.J. Super. Ct. App. Div. Nov. 19, 2020). When interpreting an insurance policy, courts should first look to the text of the policy. *See NAV-ITS, Inc. v. Selective Ins. Co. of Am*., 183 N.J.

110, 118 (2005); *Zacarias v. Allstate Ins. Co.*, 168 N.J. 590, 595 (2001).  Courts must engage in "a broad search 'for the probable common intent of the parties in an effort to find a reasonable meaning in keeping with the express general purposes of the policies.'"  *S.T. Hudson Engineers, Inc. v. Pennsylvania Nat. Mut. Cas. Co.*, 388 N.J. Super. 592, 604 (App. Div. 2006) (citations omitted).  In addition, the policy must be interpreted in a manner that falls within the reasonable expectations of the insured.  *Id.* (citation omitted).

When the policy's language is clear and unambiguous, the Court must enforce it "according to its plain and ordinary meaning."  *Stafford v. Scottsdale Ins. Co.*, 416 F. App'x 191, 194 (3d Cir. 2010) (citations omitted); *see also Simonetti*, 372 N.J. Super. at 428; *NAV-ITS*, 183 N.J. at 118; *Zacarias*, 168 N.J. at 595.  In addition, wherever possible, a court should interpret the policy to "give effect to all [of its] provisions" and "not render any provision meaningless."  *Nieves v. Lyft, Inc.*, Civ. No. 17–6146, 2018 WL 2441769, at *16 (D.N.J. May 31, 2018) (citations omitted).  Therefore, where the policy contains a definition for a particular term, the court will apply that definition in interpreting the policy.  *See, e.g., Tripodi*, 2013 WL 6903944, at *3.

Under New Jersey law, "policies should be construed liberally in [the insured's] favor to the end that coverage is afforded 'to the full extent that any fair interpretation will allow.'"  *Progressive Cas. Ins. Co. v. Hurley*, 166 N.J. 260, 273 (2001) (citations omitted); *accord Ayala*, 804 F. Supp. 2d at 281 (citations omitted); *see also Parko Props*, 2020 WL 6799137, at *3 (quoting same rule of construction).

In addition, under New Jersey law, the Court "must construe insurance policy provisions that grant coverage broadly and those that limit coverage narrowly, so as to maximize the insurance available to cover a loss."  *Zurich Am. Ins. Co. v. Keating Bldg. Corp.*, 513 F. Supp. 2d 55, 68 (D.N.J. 2007); *see also Sosa*, 458 N.J. Super. at 646 (stating that in short, "coverage provisions are

to be read broadly, exclusions are to be read narrowly, potential ambiguities must be resolved in favor of the insured, and the policy is to be read in a manner that fulfills the insured's reasonable expectations").

Nevertheless, a court should not engage in a "strained construction" of policy language to find ambiguity where none exists. *Longobardi v. Chubb Ins. Co. of N.J.*, 121 N.J. 530, 537 (1990). "[W]hen analyzing an insurance policy, the court must view it from the perspective of an average policyholder." *Tripodi*, 2013 WL 6903944, at *3; *Morrison v. Am. Int'l Ins. Co. of Am.*, 381 N.J. Super. 532, 887 (2005). A provision of an insurance policy is ambiguous if "the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." *Nunn v. Franklin Mut. Ins. Co.*, 274 N.J. Super. 543, 548 (App. Div. 1994). The insured generally bears the burden of establishing that a claim falls within the policy terms. *See Cobra Prods. Inc. v. Fed. Ins. Co.*, 317 N.J. Super. 392, 401 (App. Div. 1998). The insurer bears the burden of establishing that a coverage exclusion or limitation applies. *Id.*; *Zurich*, 513 F. Supp. 2d at 70.

## A.    NO GENUINE DISPUTE OF MATERIAL FACT

As a preliminary matter, there is no genuine dispute of material fact regarding the language of the Policy or the content of Plaintiff's or Defendant's expert reports underlying their Motions. Both parties agree that the language of the Policy and the Reports is as it appears in the briefs and Exhibits. (*See generally* P's SUMF; D's SUMF.)

Plaintiff, however, argues that there is a genuine dispute as to the cause of the 2020 Incident and the 2021 Collapse. (P's Opp'n at 6.) Plaintiff stated in its initial claim for coverage for the 2020 Incident that "wind damage" (ECF No. 38-9 Ex. F) caused the wall damage, and its experts contend that the 2021 Collapse was caused by "advanced wood decay" that was unknown to Plaintiff prior to the collapse. (P's Moving Br. at 11; WSC Report at 2.) On the other hand,

Defendant and its experts acknowledge the presence of such decay that accumulated over time, but disagree that it was "hidden" from Plaintiff (D's Moving Br. at 27–28), and argue that "ongoing water intrusion" and resulting oxide jacking were the causes of the ultimate collapse.[16]  (D's SUMF ¶ 39; Raphael Initial Report at 3; PVA Investigative Report at 6.)  Plaintiff responds that the cause of the ultimate façade collapse, as articulated in the Raphael Initial Report and the PVA Investigative Report, is incorrect and reflects Defendant's failure to properly investigate the damage.  (P's Response to D's SUMF ¶¶ 39–40, 48.)  In support of its claims, Plaintiff points to an alleged lack of physical evidence "such as moisture in the hardwood flooring," to support an "ongoing water intrusion," and that there "there were never any tenant complaints or prior losses relating to any 'seepage or leakage.'" (P's Moving Br. at 5; Trematore Decl. ¶ 11).[17]

Plaintiff's position is belied by the fact that, after the 2020 Incident, Plaintiff's own engineers, Bertin, found moisture in the walls and "organic growth" on the back face of the sheetrock (Bertin Report at 6) and Plaintiff's own expert, WSC, opined that wood decay (also known as "dry rot") that was found throughout the Property actually requires "certain levels of moisture to develop and survive" (WSC Report at 2).  Given that Plaintiff's own expert reports explicitly acknowledge the presence of moisture and water damage throughout the Property, the Court finds that no reasonable jury could find for Plaintiff as to the cause of the 2021 Collapse. *Anderson*, 477 U.S. at 248–49.

---

[16] Even if wind damage contributed to the 2020 Incident and the 2020 Collapse, the Policy excludes coverage for "rust or other corrosion, decay, hidden or latent defect . . . ."  (Policy at 18 (Section I.B.2.l.).)

[17] Despite Plaintiff's assertions that there were no prior tenant complaints or prior losses related to seepage or leakage, Plaintiff does not dispute (P's Response to D's SUMF ¶ 40) the language in the Raphael Initial Report stating that Plaintiff's prior owner had filed two weather-related water damage claims involving the Property's roof in July 2016 and July 2018.  (D's SUMF ¶ 40; Raphael Initial Report at 3–5.)  In its Opposition, Plaintiff acknowledges these prior claims (P's Opp'n at 6–7) but maintains that Defendant does not provide any evidence to support an "ongoing" water intrusion.  This statement is contradicted by Plaintiff's expert reports which opine that moisture was present throughout the Property (Bertin Report at 6) and that such moisture contributed to "advanced wood decay" or "dry rot."  (WSC Report at 2.)  In addition, "oxide jacking," one of Defendant's expert's stated causes of the collapse (Raphael Initial Report at 3; PVA Investigative Report at 6) generally results from "rust" or corrosion, often due to water.

Moreover, for the reasons set forth below, even if the parties could show a genuine dispute as to the cause of the 2021 Collapse, the Court finds that such a dispute would not be material because it would not affect the outcome of the suit. *See United Therapeutics Corp.*, 2014 WL 1405044, at *1; *Anderson*, 477 U.S. at 248. This is because the Court separately finds that the Policy does not cover Plaintiff's losses sustained during the 2020 Incident and the 2021 Collapse, regardless of whether the ultimate cause of the collapse was wind damage, advanced wood decay/dry rot, or water intrusion/oxide jacking.

## B.   AMGUARD'S MOTION

Defendant AmGUARD moves for summary judgment on Plaintiff's claim as to both the 2020 Incident and the 2021 Collapse. ("D's Prop'd Order", ECF No. 38-19.) Defendant argues that Plaintiff is precluded from coverage under the Policy because Plaintiff did not suffer a fortuitous loss; that the "Collapse" exclusion, "Dry Rot" exclusion, and "Neglect" exclusions preclude coverage; and that the "Additional Coverage" for "Collapse" and "Limited Coverage for 'Fungi', Wet Rot or Dry Rot" do not apply. (*See generally* D's Moving Br.) For the reasons stated below, Defendant's Motion will be **GRANTED**.

### 1.   Plaintiff's Loss was not Fortuitous, Precluding Coverage Under the Policy

Separately, Defendant asserts that Plaintiff "knew the building had defects at the time it was purchased and at the time the insurance policy incepted." (*Id.* at 21–22.) According to Defendant, "the falling façade was merely an ongoing manifestation of the progressive condition of the structure that was known to Plaintiff at the time it was purchased and insured." (*Id.* at 23.) Plaintiff responds that the collapse was not fortuitous because "the timing and manner of its total collapse was never foreseen . . . ." (P's Opp'n at 8.) In addition, Plaintiff points to the fact that Defendant allowed Plaintiff to renew the policy "at the same premium and values as the prior

years" and that "despite oversight by the municipality as to repairing the building, there was never a[ ] formal order to vacate the structure under the belief collapse was 'imminent.'"  (P's Opp'n at 7–8; P's Reply at 5.)

The parties do not dispute that the Policy is an "all-risk policy."  (D's Moving Br. at 22–23.)  The Policy covers "direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss."  (Policy at 1 (Section I.A.).)  Such causes of loss include "[r]isks of direct physical loss unless the loss is: . . . [e]xcluded . . . or . . . [l]imited . . . . in Section I."  (Policy at 2 (Section I.A.3.).)  This is consistent with an "all-risk policy," one that creates a "special type of insurance extending to risks not usually contemplated, and recovery under the policy will generally be allowed, *at least for all losses of a fortuitous nature* . . . unless the policy contains a specific provision expressly excluding the loss from coverage."  *Victory Peach Grp., Inc. v. Greater N.Y. Mut. Ins. Co.*, 310 N.J. Super. 82, 87 (App. Div. 1998) (emphasis added) (citing 43 Am. Jur. 2d Insurance § 505 (1982)); *accord Zurich*, 513 F. Supp. 2d at 68.

A fortuitous loss constitutes a loss when "neither party knew or contemplated that there was any defect 'at the time of the issuance of the insurance contract.'"  *Ariston Airline & Catering Supply Co., Inc. v. Forbes*, 211 N.J. Super. 472, 479 (Law Div. 1986) (citations omitted).  In other words, "so far as the parties to the insurance contract are aware, [a fortuitous loss] is dependent on chance."  *Grossberg v. Chubb Ins. Co. of N.J.*, Civ. No. L-2343-10, 2012 WL 3553002, at *5 (N.J. Super. Ct. App. Div. Aug. 20, 2012).  The burden of establishing a fortuitous loss falls on the insured.  *See Cobra Prods. Inc.*, 317 N.J. Super. at 401; *Chartis Prop. Cas. Co. v. Inganamort*, 953 F.3d 231, 234 (3d Cir. 2020).

Plaintiff attempts to argue—despite acknowledging that it knew about the Property's defects prior to the 2020 Incident and the 2021 Collapse—that Plaintiff did not foresee the exact

"timing and manner of [the façade's] total collapse." (P's Opp'n at 8.)   However, Plaintiff's argument reflects a fundamental misunderstanding of a fortuitous loss.

Generally, to constitute a fortuitous loss, neither party must have known or contemplated that there was "*any* defect" and the insured's knowledge is measured "*at the time of the issuance of the insurance contract.*"  *Ariston*, 211 N.J. Super. at 479 (emphasis added).  Although Plaintiff's declaration by its own contractor, Mr. Trematore, states that Plaintiff had no prior knowledge of the *specific* decay, this does not suffice to create a genuine dispute as to Plaintiff's notice of the defects.  (*See* Trematore Decl. ¶¶ 22–23.)  Here, prior to purchasing the Property, Plaintiff received the Sherlock Report which put Plaintiff on notice that "routine maintenance ha[d] been neglected" (Sherlock Report at 31), that there were water stains and prior water leakage throughout the Property (*id.* at 22–24, 26, 28), that the Property had "excessive wear with some neglect," and that these defects would "require immediate maintenance, repair, and attention."  (*Id.* at 31.)  This knowledge, alone, put Plaintiff on notice of the Property's defects.

Accordingly, the Court finds that there is no genuine issue of material fact as to Plaintiff's notice that the façade damage and collapse were imminent.[18]  Given Plaintiff's notice, it cannot establish that the 2020 Incident and 2021 Collapse were fortuitous losses.  This is a first basis for disqualifying Plaintiff from coverage.

2.     Plaintiff is Precluded from Coverage Under the "Collapse" Exclusion and the "Additional Coverage" for "Collapse" does not Apply

Setting aside the fortuitous loss issue, Defendant separately argues that the Policy's exclusion for Collapse (Policy at 18 (Section I.B.2.i.)) precludes coverage, and that the limited exception to that exclusion (Policy at 4–5 (Section I.A.5.d.)) does not apply.  (D's Moving Br. at

---

[18] Moreover, the fact that Defendant allowed Plaintiff to renew the Policy at the same premium and values as prior years (P's Opp'n at 7) does not change the fact that Plaintiff's prior knowledge of the defects disqualifies it from coverage because did not suffer a fortuitous loss.

25.)  Plaintiff does not dispute the applicability of the Collapse exclusion.  Plaintiff instead reiterates its argument that the decay was "hidden from view," which would trigger coverage for Plaintiff under the limited exception to the Collapse exclusion in that situation.  (P's Opp'n at 9–10.)

The Policy generally excludes from coverage "Collapse," defined as "(a) an abrupt falling down or caving in; (b) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or (c) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion" relating to paragraphs (a) and (b).  (Policy at 18 (Section I.B.2.i.(1)).)[19]  Because the Policy defines the term "Collapse" and the parties do not proffer any ambiguity regarding this specific definition, the Court must apply the Policy's definition.  *See, e.g.*, *Tripodi*, 2013 WL 6903944, at *3–5 (applying a policy's definition of "Collapse" where the policy included a definition of the term and both parties agreed that the definition was not ambiguous); *see also Stafford.*, 416 F. App'x at 194.

*a)      The Collapse was not "Abrupt"*

The burden is on the insured to prove the applicability of exceptions to exclusions.  *See, e.g.*, *Woodcliff Lake Bd. of Educ. v. Zurich American Ins. Co.*, Civ. No. A-5772-11T3, 2013 WL 4081012, at *3, 5–6 (N.J. Super. App. Div. Aug. 14, 2013).

Here, the exception that Plaintiff seeks to invoke is found in a section on "Additional Coverage" for "Collapse."  (Policy at 4–5 (Section I.A.5.d.).)  The exception provides that AmGUARD will only pay for "abrupt collapse" of an insured building or any part of the building,

---

[19] However, the exclusion contains a limited carve-out for certain losses that *will* be covered, including coverage for "loss or damage caused by [a] Covered Cause of Loss," if the collapse results in such a Covered Cause of Loss.  (Policy at 18 (Section I.B.2.i.(1)(c)).)  The exclusion also does not apply to collapse caused by the "specified causes of loss." (*Id.*)  The Court does not reach these carve-outs because the parties do not address them in their briefings.

if such collapse is caused by, in relevant part, "[b]uilding decay that is *hidden from view*, *unless the presence of such decay is known to an insured* prior to collapse." (*Id.* (Section I.A.5.d.(2)(a)).)

Defendant argues that there is nothing "abrupt" about the 2020 Incident or the 2021 collapse, because "the cracking and other damages present in the building were the result of ongoing water intrusion and excessive wear over time." (D's Moving Br. at 27.) As Defendant notes on reply, Plaintiff does not respond to this argument in its Opposition. (D's Reply at 9.)

The Policy does not define "abrupt." Therefore, the Court must apply the plain and ordinary meaning of the term, viewing it from the perspective of an average policyholder and in the context of the Policy as a whole. *Tripodi*, 2013 WL 6903944, at *3; *Morrison v. Am. Int'l Ins. Co. of Am.*, 381 N.J. Super. 532, 887 (2005). The dictionary defines "abrupt" as "characterized by or involving action or change without preparation or warning; sudden and unexpected." *Abrupt*, Merriam-Webster, https://www.merriam-webster.com/dictionary/abrupt (Apr. 1, 2024, 4:04 PM); *accord* *Abrupt*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/abrupt (Apr. 1, 2024, 4:04 PM) (defining "abrupt" as "sudden and unexpected"); *c.f. Cypress Point Condo. Ass'n Inc. v. Adria Towers, LLC.*, 226 N.J. 403, 425–26 (2016) (endorsing reliance on dictionary definitions as a first step when interpreting undefined terms in an insurance policy). Furthermore, New Jersey courts have determined that to qualify as "abrupt," a collapse must have "happened suddenly and unexpectedly . . . , without any warning, as opposed to happening gradually over a period of several weeks or months." *Tripodi*, 2013 WL 6903944, at *5 (citation omitted); *Parko Props.*, 2020 WL 6799137, at *5 ("We construe the 'abrupt' requirement to exclude a collapse that occurred gradually over an extended period of time."); *accord* 10A Steven Plitt et al., Couch on Insurance § 148:54 (3d ed. 2020) (distinguishing "a gradual occurrence over a period of time" from collapse—a "sudden or

relatively abrupt occurrence causing serious structural damage").   Moreover, an average policyholder would interpret an "abrupt" collapse as happening suddenly as opposed to gradually.

Despite Plaintiff's declaration by its own contractor, Mr. Trematore, that there was no prior evidence of "moisture in the hardwood flooring" or "continuous . . . seepage or leakage" (Trematore Decl. ¶¶ 10–11), the incidents were neither "sudden" nor "unexpected."  The Sherlock Report observed water stains and water damage throughout the Property's three floors (Sherlock Report at 22–24, 26, 28), opined that "the building reflects excessive wear with some neglect," and concluded that "the structural, cosmetics, maintenance areas, electro-mechanical, plumbing systems, and the roof will require immediate maintenance, repair, and attention."  (*Id.* at 31.) Likewise, the Raphael Initial Report additionally stated that "ongoing water intrusion" was the cause of the 2020 Incident (Raphael Initial Report at 3) and the PVA Investigative Report cited the same cause for the 2021 Collapse, while acknowledging the decay specified in the WSC Report.  (*See* PVA Investigative Report at 6).   Moreover, the WSC Report and the Bertin Supplemental Report also cited "long-term" advanced wood decay as the cause of the collapse. (WSC Report at 2; Bertin Suppl. Report at 1.)  Accordingly, the Court finds that Plaintiff has failed to raise a genuine issue of material fact as to whether the 2020 Incident and 2021 Collapse qualifies as "abrupt."

> b)      *The Decay was not "Hidden"*

Just as Plaintiff has failed to raise a genuine issue of material fact as to the collapse being "unexpected," it has not raised a genuine issue regarding the decay being "hidden from view." The Policy provides that coverage for a collapse caused by decay is warranted only where that decay is "hidden from view, *unless* the presence of such decay is known to an insured prior to collapse."  (Policy at 4–5 (Section I.A.5.d.(2)(a))) (emphases added).  Therefore, assuming decay

were the cause of the collapse, the decay would need to be both hidden *and* unknown to Plaintiff prior to the collapse.

The meaning of "decay" is not disputed, whereas the term "hidden" is disputed and is not defined in the Policy.  However, when construing the term 'hidden decay,' courts have opined that defining "hidden" as "not visible," "out of sight or off the beaten track: concealed" comports with the ordinary meaning of the term.  *See, e.g.*, *Wurst v. State Farm Fire & Cas. Co.*, 431 F. Supp. 2d 501, 505 n.7–06 (D.N.J. 2006) (quoting dictionary definitions; holding that insured's testimony was insufficient to support claim that decay was hidden, when certain portions of testimony indicated that decay was not visible but other portions demonstrated that cracks throughout the basement wall were clearly visible).  The Court endorses this interpretation of the ordinary meaning of "hidden."  This is consistent with the Policy's language itself, which excludes from coverage hidden decay in cases where the insured knew of the decay prior to the collapse.  (*See* Policy at 4–5 (Section I.A.5.d.(2)(a)).)

As noted above, prior to purchasing the Property, Plaintiff was informed via the Sherlock Report of water stains and water damage in multiple apartments and areas throughout the Property. (Sherlock Report at 22–24, 26, 28.)  The Sherlock Report disclosed that maintenance had been neglected and required "immediate" attention (*id.* at 31), and it advised that the property be "further evaluate[d] for hidden damage and possible mold."  (*Id.* at 26.)  Even still, Plaintiff purchased the Property.

After the 2020 Incident, Plaintiff was repeatedly advised prior to the 2021 Collapse that the Property was in dire need of repair.  On September 17, 2020, Plaintiff's engineers, Bertin, observed several cracks in the walls, noted that the front wall needed "immediate attention due to the displacement of the wall and the presence of moisture in the wall cavity," and recommended

27

that the "danger" be addressed before the coming winter.  (Bertin Report at 5–6.)  Meanwhile, on October 16, 2020, the municipality posted an Unsafe Structure Notice on the Property, which notified Plaintiff that the Property posed a danger to the public due to its "loose façade."  (Unsafe Structure Notice.)  The Raphael Initial Report of October 29, 2020, expressed similar concerns, adding that PVA had observed "ongoing water intrusion" and "oxide jacking" in the Property façade.  (Raphael Initial Report at 3.)  The same day, PVA confirmed "horizontal cracking" in the Property's exterior and interior, as well as dampness and water staining in the interior, and advised that "[t]he south façade is in a very dangerous condition with the structural integrity questionable." (PVA Initial Report at 3–4.)  Around the time of the November 5, 2020, denial letter, the municipality also ordered Plaintiff to repair the Property façade, and to take safety measures "immediately for protection of the public."  (ECF No. 39-3 Ex. E.)

Even viewing the facts in a light most favorable to Plaintiff such that it may have been unaware of the *specific* decay in the second-floor wall beam that it claims was the cause of the collapse, Plaintiff has not refuted (*see* Trematore Decl. ¶¶ 10–11, 22–23) Defendant's evidence that Plaintiff was nonetheless aware of the general condition of the building, even before it purchased the Property, and was made aware of its condition on many occasions thereafter.  This triggers the caveat to the "hidden decay" exception: hidden decay is covered *only if* the insured had *no knowledge* of the condition prior to the collapse.  (Policy at 4–5 (Section I.A.5.d.(2)(a))) (emphases added).  *Wurst*, 431 F. Supp. 2d 501, 505–06 (D.N.J. 2006).[20]  Therefore, Plaintiff's

---

[20] Even if the collapse could be characterized as abrupt or the decay could be characterized as hidden, the Court agrees with Defendant that the Additional Coverage for Collapse would still not apply.  (D's Moving Br. at 27; D's Opp'n at 3.)  The Policy provides that the additional coverage does *not* apply to:

> (a) *A building or any part of a building that is in danger of falling down or caving in*;
> (b) A part of a building that is *standing, even if it has separated from another part of the building*; or

knowledge of the defects is imputed and any decay cannot be deemed "hidden." In short, the Court also finds that Plaintiff has failed to raise a genuine dispute of material fact as to whether the decay was "hidden."

For all the reasons stated above, Defendant's Motion will be **GRANTED**.[21]

## C.   10 E. WASHINGTON AVE.'S CROSS-MOTION

Plaintiff 10 E. Washington Ave. moves for summary judgment, seeking reimbursement for all of its alleged losses in connection with the 2020 Incident and the 2021 collapse. ("P's Prop'd Order", ECF No. 39-5.) Plaintiff argues that the collapse was a fortuitous occasion not foreseen by the municipality or Defendant (P's Moving Br. at 10; P's Opp'n at 8; P's Reply at 5), and that the 2020 Incident and 2021 Collapse were "abrupt," affording Plaintiff coverage. (P's Reply at 4.) Plaintiff also argues that the Policy unambiguously covers a collapse caused by hidden decay, which Plaintiff claims was the cause of the collapse.[22] (P's Moving Br. at 11; P's Reply at 4.) According to Plaintiff, Defendant's November 2020 denial of coverage was based on an

---

(c) A building that is *standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion*.

(Policy at 4–5 (Section I.A.5.d.(3))) (emphases added). The undisputed evidence shows that the Property was still standing at the time of the 2020 Incident and the 2021 Collapse. (*See, e.g.*, Bertin Report at 3, 5–6 (discussing the condition of the Property after the 2020 Incident); ECF No. 39-3 Ex. G (a photograph of the Property showing the collapsed exposed façade with scaffolding in front of the first-floor retail store after the 2021 Collapse.)

[21] Defendant raises additional arguments why Plaintiff should be denied coverage that the Court need not reach given its conclusion. The Court does note that it rejects Plaintiff's position that the "Fungi", Wet Rot or Dry Rot exclusion is contradicted by the "hidden decay" exception to the Collapse exclusion and therefore renders the "Fungi", Wet Rot or Dry Rot exclusion ambiguous such that the Policy should be read in Plaintiff's favor. (P's Opp'n at 9; P's Reply at 4.) As Defendant makes clear in its Reply, the two provisions may co-exist. (*See* D's Reply at 9–10.) The "hidden decay" provision appears in an entirely different section of the Policy: the Collapse exclusion. As such, the "hidden decay" provision may apply to other types of decay than those excluded under the "Fungi", Wet Rot or Dry Rot exclusion, and may still allow for coverage when fungi, wet rot, or dry rot result from a "specified cause of loss" other than fire or lightning. (D's Reply at 10.)

[22] As the Court has already explained, the Court disagrees with Plaintiff's assertion that the "Fungi", Wet Rot or Dry Rot exclusion is contradicted by the "hidden decay" exception to the Collapse exclusion and therefore creates an ambiguity. (P's Opp'n at 9; P's Reply.) Plaintiff cannot argue both that its losses are "unambiguously" covered under the "hidden decay" provision, and that an ambiguity exists due to a conflict with another provision of the Policy such that the Policy should be read in its favor.

unsubstantiated claim of "ongoing water intrusion," and its March 2021 decision to "uphold the disclaimer" of coverage were unsupported by the evidence and made in bad faith without any additional inspection. (P's Moving Br. at 10–11.) Defendant responds that Plaintiff is precluded from coverage by numerous Policy provisions including the Collapse exclusion and the "Fungi", Wet Rot or Dry Rot exclusion, and that there was clearly evidence of water seepage and leakage in the Property prior to the 2020 Incident and the 2021 Collapse, as discussed in both the Sherlock Report and the Bertin Report. (D's Opp'n at 2–5.)

For the reasons stated below, the Court will **DENY** Plaintiff's Cross-Motion for Summary Judgment.

> 1.  There is no Genuine Dispute of Material Fact that the 2020 Incident and the 2021 Collapse were not Fortuitous Losses; that Plaintiff is not Covered Under the Policy's "Collapse" Provisions; and that Plaintiff cannot Seek Coverage Under Additional Policy Provisions

The Court has discussed extensively the reasons why no reasonable jury would find that Plaintiff is entitled to coverage for its losses sustained in the 2020 Incident and 2021 Collapse. For the same reasons, the Court finds that Plaintiff is not entitled to affirmative summary judgment on those issues.

> 2.  There is no Genuine Dispute of Material Fact that Defendant did not Act in Bad Faith When It Denied Coverage for the 2020 Incident and the 2021 Collapse

Separately, Plaintiff argues that Defendant's denial of coverage was in "bad faith" because there was allegedly no evidence of a "continuous leak" or water seepage and leakage to support AmGUARD's November 2020 denial of coverage and its March 2021 upholding of its prior determination. (P's Moving Br. at 10; P's Reply at 5.)[23] According to Plaintiff, Defendant denied

---

[23] Plaintiff relies on images it claims purport to show there was "never any physical evidence, such as moisture in the hardwood flooring, of 'seepage or leakage.'" (P's SUMF ¶ 7; ECF No. 39-3 Ex. D.) However, the quality of the black-and-white photocopied images is too poor to draw any conclusions on this matter. (ECF No. 39-3 Ex. D.)

coverage in March 2021 without an additional site visit, relied on "unreliable 'circumstantial' evidence" in its denials of coverage (*see* P's Reply at 6), and did not conduct an additional inspection of the Property until June 27, 2022. (*See* P's Moving Br. at 6; P's Reply at 6.) Defendant responds that both the Sherlock Report in 2019 and the Bertin Report in September 2020, observed moisture or water throughout the affected portions of the Property, providing a reasonable basis for denial of coverage in 2020 and 2021. (D's Opp'n at 4–5.) For the reasons stated below, the Court finds that Defendant did not act in bad faith in its denial of coverage.

"The duty of good faith and fair dealing pervades insurance contracts." *Sears Mortg. Corp. v. Rose*, 134 N.J. 326, 634 A.2d 74, 84 (N.J. 1993); *accord Price v. N.J. Mfrs. Ins. Co.*, 182 N.J. 519, 867 A.2d 1181, 1185 (N.J. 2005). Under New Jersey Law, "to establish a claim for bad faith in the insurance context, a plaintiff must show two elements: (1) the insurer lacked a 'fairly debatable' reason for its failure to pay a claim, and (2) the insurer knew or recklessly disregarded the lack of a reasonable basis for denying the claim." *Ketzner v. John Hancock Mut. Life Ins. Co.*, 118 F. App'x 594, 599 (3d Cir. 2004); *accord Mercer*, 2020 WL 6799137, at *7 (citation omitted); *see also Pickett v. Lloyd's*, 131 N.J. 457, 621 A.2d 445, 453 (N.J. 1993) (same).

"If there is a valid question of coverage, i.e., the claim is 'fairly debatable,' the insurer bears no liability for bad faith." *Mercer*, 2020 WL 6799137, at *7 (citation omitted). In other words, "a plaintiff must show the lack of a reasonable basis for denying the claim or unreasonably delaying its processing, and the insurer's knowledge or reckless disregard that it was acting unreasonably." *Wacker-Ciocco v. Gov't Emp. Ins. Co.*, 439 N.J. Super. 603, 611 (App. Div. 2015); *see also Universal North Am.*, 2013 WL 6903944 at *11 (same). However, Plaintiff fails to raise a genuine dispute of material fact regarding whether AmGUARD acted with reckless disregard of the evidence: AmGUARD did not.

First, Defendant had a reasonable basis for denying Plaintiff's claim.  In 2019, the Sherlock Report put Plaintiff on notice, prior to Plaintiff's purchase of the Property that water and water stains were present in a number of apartments.  (Sherlock Report at 22–24, 26, 28.)  On September 17, 2020, Plaintiff's engineer, Bertin, observed "the presence of moisture in the wall cavities" and proposed exposing the lintel because "water has been seeping into the wall cavity and may have impacted the lintel."  (Bertin Report at 3, 6.)  In addition, the Raphael Initial Report of October 29, 2020, pointed to two weather-related water damage claims involving the Property's roof in July 2016 and July 2018  (Raphael Initial Report at 3–5.)  Plaintiff does not dispute the existence of these prior observations, but argues that they are not evidence of "ongoing" water intrusion.  (P's Reply at 5.)  Plaintiff's assertion is contradicted, however, by the fact that its own expert, WSC, opined on September 15, 2021, that the advanced wood decay (dry rot) that was found throughout the Property actually requires "certain levels of moisture to develop and survive."  (WSC Report at 2.)  Plaintiff's single declaration by its own contractor, Mr. Trematore, does not suffice to make Defendant's denial of coverage unreasonable.  (P's Reply at 5; Trematore Decl. ¶ 10.)  The evidence, viewed in the light most favorable to Defendant, suggests a "reasonable basis" for denying Plaintiff's claim in 2020.  Plaintiff has not shown that Defendant acted with reckless disregard of such evidence.

Second, even if the Raphael Report stated the reason for denial of coverage in November 2020 as "ongoing water intrusion," it also cited other provisions that preclude Plaintiff from coverage.  These include exclusions for "Neglect," "Other Types of Loss," "Continuous Or Repeated Seepage or Leakage O[f] Water," and "Negligent Work."  (Policy at 18–19 (Sections I.B.2.k., l. & p.; I.B.3.c.).)  As discussed in the context of Defendant's Motion, the "Neglect" and "Negligent Work" exclusions preclude Plaintiff from coverage because Plaintiff did not use "all

reasonable means [or steps]" to preserve the Property and prevent it from further damage.  (D's Moving Br. at 29–30; D's Reply at 3, 11–12.)  Furthermore, as discussed in the context of Defendant's Motion, the Policy's exclusions for Collapse and "Fungi", Wet Rot or Dry Rot preclude Plaintiff from coverage, and the limited exceptions to those exclusions do not apply because Plaintiff had notice of the deteriorating condition of the Property prior to the 2020 Incident and the 2021 Collapse.  In short, Plaintiff has failed to raise a genuine issue of material fact that Defendant acted in bad faith when it conducted its inspections, denied coverage after the 2020 Incident, or upheld its denial of coverage after the 2021 Collapse.

For the foregoing reasons, Plaintiff's Cross-Motion for Summary Judgment will be **DENIED**.

## V.    **<u>CONCLUSION</u>**

For the above reasons, the Court will **GRANT** Defendant's Motion for Summary Judgment and **DENY** Plaintiff's Cross-Motion for Summary Judgment.  An appropriate Order will follow.

Date: **April 22, 2024**

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**
